1

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                      AT CINCINNATI

4

5   TEDDY NICHOLS                    CASE NO.

6       Plaintiff                    C-1-02-0045

7   Versus

8   INDIANA MICHIGAN POWER

9   CO. RIVER TRANSPORTATION

10  DIVISION and/or AMERICAN

11  ELECTRIC FUEL SUPPLY,

12  RIVER TRANSPORTATION

13  DIVISION                         JUDGE BECKWITH

14

15           Deposition of RON CAMPANA taken

16  before Julianne W. Andressen, Certified

17  Court Reporter in and for the State of

18  Louisiana, in the offices of Campana

19  Marine, 4432 Wabash Street, Metairie,

20  Louisiana, on Wednesday, March 24, 2004.

21

22  REPORTED BY:

23      JULIANNE W. ANDRESSEN

24      Certified Court Reporter

25
```

                                                                    2

1    A P P E A R A N C E S:

2

3    Representing the Plaintiff:

4         O'BRYAN, BAUN & COHEN

5         (BY:  Gary Wm. Baun, Esq.)

6         401 S. Old Woodward

7         Suite 320

8         Birmingham, MI   48009

9

10

11   Representing the Defendants:

12        SCHROEDER, MAUNDRELI, BARBIERE & POWERS

13        (BY:  Todd M. Powers, Esq.)

14        11935 Mason Road

15        Suite 110

16        Cincinnati, OH   45249-3703

17

18

19

20

21

22

23

24

25

3

```
 1                    EXAMINATION INDEX

 2

 3   Stipulation                      Page 4

 4   Examination by Mr. Powers        Page 5

 5

 6

 7                     EXHIBIT INDEX

 8

 9   No. 1      Report of Ron Campana

10              dated 12/20/03         Page 34

11

12

13   No. 2      Curriculum Vitae       Page 35

14

15

16   No. 3      Photos taken by

17              Ron Campana            Page 80

18

19

20   No. 4      Videotape taken

21              by Ron Campana         Page 83

22              (Not tendered to the

23               court reporter)

24

25
```

4

```
 1              S T I P U L A T I O N

 2              It is stipulated and agreed by

 3     and between Counsel for the various parties

 4     hereto that the deposition of RON CAMPANA

 5     may be taken for all discovery and all

 6     other purposes, in accordance with the

 7     Federal Rules of Civil Procedure, at the

 8     time and place hereinabove recited;

 9              That all formalities save those

10     of reading and signing are hereby

11     specifically waived;

12              That all objections, save

13     objections as to the form of the questions

14     and the responsiveness of the answers, are

15     reserved until such time as this

16     deposition, or any part hereof, is used or

17     sought to be used in evidence at the time

18     of the trial of this matter.

19              *    *    *    *    *

20              JULIANNE W. ANDRESSEN

21     Certified Court Reporter in and for the

22     State of Louisiana, officiated in

23     administering the oath to the above-named

24     witness.

25
```

5

```
 1                    RON CAMPANA,

 2    640 Brouilly Drive, Kenner, Louisiana

 3    70065, after having been first duly sworn

 4    in the cause by the above-named Certified

 5    Court Reporter, testified on his oath as

 6    follows:

 7    EXAMINATION BY MR. POWERS:

 8         Q.     State your name for the record,

 9    please.

10         A.     Ronald Louis Campana.

11         Q.     Mr. Campana, you and I met before

12    in another case where you were an expert,

13    and I know you have been deposed several

14    times.  How many times would you say you

15    have been deposed in the past five years?

16         A.     (No response).

17         Q.     Well, let me say this:  The last

18    time I took your deposition you said you

19    thought you had given 50 depositions

20    throughout your career.  Does that sound

21    right?

22         A.     Yes, sir.

23         Q.     So you know what the rules are?

24         A.     Yes, sir.

25         Q.     I am going to ask you questions,
```

6

1    you are going to give me accurate answers;

2    and if you don't understand the question,

3    you are going to tell me; right?

4        A.    Correct.

5        Q.    Okay.  Tell us where we are

6    today.  We are in your office.  What is the

7    name of the company here?

8        A.    Campana Marine Service, Inc.

9        Q.    And that is one company that you

10   are affiliated with; is that correct?

11       A.    Yes, sir.

12       Q.    What other companies are you

13   affiliated with?

14       A.    Federal Marine Bureau, LLC and

15   Captain Joe Gray Surveyors, LLC.

16       Q.    Which organization or company,

17   entity, whatever you want to call it are

18   you representing in testifying in this

19   case?

20       A.    Campana Marine Service, Inc.

21       Q.    Are there any other individuals

22   who have a financial interest in that

23   entity besides yourself?

24       A.    My wife.

25       Q.    But you do the work here; right?

7

```
1         A.      Correct.

2         Q.      Do you have any employees?

3         A.      No.

4         Q.      Tell me what Campana Marine

5    Service does.

6         A.      Independent marine surveyors and

7    consultants.

8         Q.      And tell me what Federal Marine

9    Bureau, LLC -- Is that what it is?

10        A.      Yes, sir.

11        Q.      Tell me what Federal Marine

12   Bureau, LLC does.

13        A.      Independent marine surveyors and

14   consultants.

15        Q.      And what was the other?

16        A.      Captain Joe Gray Surveyors, LLC.

17        Q.      Captain Joe Gray Surveyors, yes.

18   What does that company do?

19        A.      The exact same thing, independent

20   marine surveyors and consultants.

21        Q.      You also have from time to time

22   been identified and testified as an expert

23   in marine cases; is that correct?

24        A.      Yes, sir.

25        Q.      Can you tell me how many times
```

1   you have been retained to testify in cases

2   involving litigation?  Go ahead and see if

3   you can answer it that way.  I can break it

4   down if you want me to.

5          A.     In my career?

6          Q.     Yes, sir.

7          A.     It would just be a guess, over a

8   hundred.

9          Q.     Have any of those cases involved

10  a situation similar to the one that we are

11  dealing with here where an individual was

12  injured and the claim is that the unloading

13  operation, if you will, that's what I am

14  going to call this operation, this Sporn

15  plant operation, was improperly conceived

16  or dangerous or created an unsafe work

17  place, have you ever testified in a case

18  where you have rendered opinions such as

19  those that you have in this case?

20         A.     I honestly don't remember.

21         Q.     Okay.  I have your home address

22  as 640 -- Is it Brouilly?

23         A.     Brouilly; right.

24         Q.     B-r-o-u-i-l-y?

25         A.     It's double "l."

9

```
 1        Q.      Two "l's", okay.  And that is in

 2   Kenner?

 3        A.      Yes, sir.

 4        Q.      What is your date of birth, sir?

 5        A.      10/17/47.

 6        Q.      And you have a degree from Kings

 7   Point, don't you?

 8        A.      Yes, sir.

 9        Q.      What is the degree?

10        A.      A Bachelor of Science in marine

11   transportation.

12        Q.      Any education or training beyond

13   that degree?

14        A.      Other than the self-study course

15   in the National Cargo Bureau Grain

16   Stability, that's it.

17        Q.      You are not an engineer?

18        A.      No, sir.

19        Q.      And you do not claim to have

20   expertises in engineering?

21        A.      No, sir.

22        Q.      You are not an ergonomist and

23   don't plan to have expertise in that area;

24   is that fair?

25        A.      That's fair.
```

1        Q.      Can you tell me what expertise it

2    is that you bring to this case that makes

3    you represent yourself to the Court as an

4    expert?

5        A.      Marine safety, marine operations,

6    vessel operations, common sense.

7        Q.      Marine safety --

8        A.      Right; marine operations, vessel

9    operations --

10       Q.      -- and common sense?

11       A.      Yes.

12       Q.      Tell me what training, what

13    formal training you have had in marine

14    safety.

15       A.      Thirty years in the industry and

16    being a vessel master.

17       Q.      So that would be on-the-job

18    experience?

19       A.      Yes.

20       Q.      Tell me what specific formal

21    training you have had in marine operation,

22    or maybe you said marine operations, is

23    that what --

24       A.      Well, in marine operations I was

25    a director of operations, manager of

11

1     operations for Prudential Lines, a

2     steamship company in New York, with the

3     barge operations worldwide.

4          Q.     So on-the-job training --

5     on-the-job experience, not training, but

6     on-the-job experience is what you're

7     saying; correct?

8          A.     Well, our education at Kings

9     Point and the degree in marine

10    transportation and then the skills that you

11    were taught at Kings Point and the

12    education applied in the real world, yes.

13         Q.     Okay.  I want to make sure that I

14    understand that what you are saying is from

15    the time you left Kings Point, with respect

16    to marine operations you have not had any

17    additional formal training; is that fair?

18         A.     Yes, sir.

19         Q.     And vessel operation, same

20    questions, have you had any formal training

21    beyond the training you received at Kings

22    Point?

23         A.     No, sir.

24         Q.     Have you ever yourself designed a

25    system that had as its goal unloading

12

1    barges in a fashion that is involved here

2    at this Sporn plant?  In other words, at

3    the Sporn plant, do I understand correctly

4    that barges are brought in loaded with coal

5    and they are unloaded for use in the plant?

6        A.    Correct.

7        Q.    All right.  Have you ever

8    designed a system, an unloading system for

9    barges such as the one involved in the

10   Sporn plant?

11       A.    No, sir.

12       Q.    Have you ever been involved in

13   the mechanical construction of such a

14   system?

15       A.    No, sir.

16       Q.    Have you been around such

17   systems?

18       A.    Yes, sir.

19       Q.    When and where?

20       A.    In the past 20 years in the Lower

21   Mississippi River, I represent all the

22   major gantry terminals.

23       Q.    When you say that you represent

24   the gantry terminals, in what capacity do

25   you represent them?

1      A.    As a consultant and independent

2   surveyor.

3      Q.    And as a consultant and

4   independent surveyor for those gantry

5   terminals -- Now, by the way, what is a

6   gantry terminal, just so that we are on the

7   same page here.

8      A.    That's a short crane that uses a

9   grab bucket to discharge bulk material.

10      Q.    Okay.  Tell me which gantry

11   terminals we are talking about on the Lower

12   Mississippi.

13      A.    At Burnside Terminal a division

14   of Ormet, International Marine Terminals

15   down at Myrtle Grove, IC Marine Railroad up

16   in Convent, and the Mississippi River Gulf

17   Outlet, for 15 years it was the New Orleans

18   Public Terminal, a public bulk terminal

19   which no longer exists.

20      Q.    Is coal unloaded at any of those

21   facilities?

22      A.    Yes, at IMT.  Also, Electro-Coal

23   Terminal down Davant.

24      Q.    Electro-Coal Terminal?

25      A.    Yes.

14

```
1        Q.      Is that a NEMCO operation?

2        A.      IMT is.  IMT through -- It's a

3    division of NEP --

4        Q.      All right.  And how long have you

5    represented them?

6        A.      IMT?

7        Q.      Yes.

8        A.      Seven, eight years.

9        Q.      Do they know you are testifying

10   in this case?

11       A.      IMT?

12       Q.      Yes.

13       A.      No.

14               MR. BAUN:

15                    I am going to make an

16   objection as to use of that knowledge

17   outside of this proceeding.

18               MR. POWERS:

19                    Well, that's between him

20   and them.  I don't care.

21               THE WITNESS:

22                    I don't discuss any of the

23   legal cases with any of my clients unless

24   the client is involved in the case.

25               MR. POWERS:
```

15

```
 1                    Okay.

 2    EXAMINATION BY MR. POWERS:

 3         Q.    I asked you which of these

 4    terminals unloaded coal and you told me

 5    that.  Tell me what your representation has

 6    involved with respect to any of these

 7    terminals.  In other words, have you

 8    consulted with respect to the design or the

 9    mechanical operation of the unloading

10    facilities?

11         A.    No.

12         Q.    Has your consulting been limited

13    to vessel issues?

14         A.    Vessel, cargo and personal

15    injury.

16         Q.    And when you say personal injury,

17    have any of the personal injuries involved

18    someone who claims to have gotten jerked by

19    a pullout cable or some similar mechanism

20    in an unloading process?

21         A.    Not with terminals; in fleeting

22    barges picking up shore wires, yes.

23         Q.    Have you ever been to Huntington

24    Terminal?

25         A.    No.
```

1        Q.      Have you ever been to any of the

2    coal unloading terminals on the Ohio or the

3    Conar (spelled phonetically) River, other

4    than the Sporn plant?

5        A.      No.

6        Q.      Do you know through your

7    experience, your training or from any

8    source of information the method, the

9    design or the mechanical operation used at

10   those facilities on the Ohio and Conar

11   River for unloading coal?

12       A.      Some of them, yes.

13       Q.      And how do you -- First of all,

14   how do you have that information?

15       A.      From the safety video in this

16   case that was produced and from another

17   expert in the case that we were both

18   involved in, Captain Pat Jameson.

19       Q.      Captain Jameson is not in this

20   case, that I know of.

21       A.      No.

22       Q.      Okay.  Have you talked to Captain

23   Jameson about this case?

24       A.      Not specifically about this case.

25   We had discussions over the past year in

17

```
 1    general about terminals, Lower Mississippi

 2    versus the different terminals --

 3         Q.     Are you relying on the

 4    information that Mr. Jameson gave you?

 5         A.     No.

 6         Q.     Okay.  You said that you have

 7    given 50 depositions approximately in your

 8    career, and I asked you how many times -- I

 9    think I asked you, if I haven't I am going

10    to ask you, how many times you have been

11    retained in the last four years.  Do you

12    have some idea, or do you have a list of

13    cases in which you have been retained over

14    the last four years?

15         A.     No.  I only have a list of the

16    cases I gave a deposition or went to court

17    in.

18         Q.     How many of the cases that you

19    have listed in your disclosure involved

20    cases in which you were retained or called

21    on behalf of the defendant?  And if you

22    want to give me a percentage --

23         A.     It's pretty close to 50/50.

24         Q.     Have you ever rendered an

25    opinion, to your recollection, that a
```

18

1    particular type of unloading mechanism or

2    design, and again I am referring back to

3    this Sporn situation where there is an

4    unloading of bulk cargo, was reasonably

5    safe?

6        A.    In the past four years or ever?

7        Q.    Ever.

8        A.    Once again, I honestly don't

9    remember.

10       Q.    Okay.  Do I understand,

11   Mr. Campana, that the vast bulk of your

12   work involves representing stevedores to

13   ascertain the condition of cargo?

14       A.    No.  That's about 50 percent of

15   my business.

16       Q.    What is the reset of your

17   business?

18       A.    To represent owners, charterers,

19   receivers of cargo.

20       Q.    How does that differentiate

21   from -- Oh, okay, so all of it deals with

22   cargo.  Half of your representation is

23   stevedores and half of your representation

24   is the owners of the cargo?

25       A.    Well, it doesn't all deal with

1    cargo.  If there is damage, vessel damage,

2    vessel condition surveys, consulting.  I am

3    a consultant to my stevedores that I

4    represent on their daily operations in a

5    roving mode.  And by that I mean when I am

6    out there.  And it could be for them, it

7    could be for another one of my clients that

8    they are doing work for.

9        Q.     What does that involve when you

10   are consulting for a stevedore?

11       A.     If I see something that I think

12   is of an improper or an unsafe nature, then

13   I report it to my client.

14       Q.     Have you ever had a situation

15   where you made a recommendation that a

16   method that was being used for unloading

17   cargo was changed?

18       A.     Yes.

19       Q.     Can you tell me when that was and

20   what the recommendation was and the

21   circumstances.

22       A.     Numerous times throughout the

23   years when they would be loading older

24   barges and they would want to load one end

25   and the other and put nothing in the

1    middle.

2        Q.      Which might lead to hogging the

3    barge; right?

4        A.      Hogging or sagging of the barge;

5    correct.

6        Q.      Any other examples where you have

7    given recommendations concerning how a

8    vessel should be loaded or unloaded or how

9    it should be moved in the process of that

10   happening?

11       A.      Well, that is also part of my

12   routine.  In the discharge of the vessels,

13   specifically at the Burnside Terminal, we

14   meet with the captain and the chief officer

15   and we discuss the discharge rotation or

16   the loading rotation for the safety of the

17   vessel and for the safe handling of cargo

18   and the safety of the stevedores.

19       Q.      Have you ever been involved,

20   Mr. Campana, in authoring safety rules or

21   procedures for any facility similar to the

22   Sporn plant?

23       A.      No, sir.

24       Q.      And as I understand it, you have

25   no formal training in safety; is that

1    correct?

2        A.      Correct.

3        Q.      Do I understand that you have

4    never had as your primary responsibility

5    the training of crew members aboard

6    vessels, safety training?

7        A.      No.  As master, I was responsible

8    for the safety training.

9        Q.      Tell me what that involved.

10       A.      The application of good marine

11   practices and safe practices.

12       Q.      Were you ever given the duty or

13   charged with creating an instruction film

14   for either seamen or stevedores?

15       A.      No, sir.

16       Q.      And I think you said you have

17   never authored safety rules.  Have you ever

18   authored procedures for individuals

19   unloading bulk cargo from barges, any

20   written procedures?

21       A.      No.  But I've got to correct

22   something.  I have authored the procedures

23   for the loading and unloading of LASH

24   barges.

25       Q.      Okay, tell me about that.  What

22

1    was your involvement with that?

2         A.     As the director -- or I shouldn't

3    say director, as the manager of operations

4    for Prudential Lines I authored, developed

5    and established worldwide, which in that

6    time was the Mediterranean and the United

7    States, the air test procedure for testing

8    LASH barges for suitability to carry cargo

9    and the proper procedure for loading that

10   cargo and the procedures, if the barges

11   were found defective what to do.

12        Q.     There were some measurements

13   taken, some forces measured.  There was an

14   analysis done of the forces exerted on

15   these employees by Mr. Herrin (spelled

16   phonetically).  Did you have anything to do

17   with any of that part of the testing and

18   investigation of this case?

19        A.     Other than witnessing it, no.

20        Q.     Okay.  Tell me what it is that --

21   Well, let me ask you first: What --

22   Obviously, you are being paid in this case.

23   What are you charging Mr. Baun for the work

24   that you are doing?

25        A.     A hundred seventy-five an hour

1   plus expenses.

2      Q.     You are charging him $175.00 per

3   hour for everything you are doing in the

4   case?

5      A.     Yes.

6      Q.     And that includes --

7      A.     Except travel time.

8      Q.     And what do you charge travel

9   time?

10     A.     One fifty an hour.

11     Q.     Trial testimony time?

12     A.     One seventy-five an hour.

13     Q.     And --

14     A.     No, I take that back, it's $350

15  an hour.

16     Q.     Okay.  So testimony is $350 an

17  hour.  Everything else is $175 an hour,

18  except travel, which is $150 an hour?

19     A.     Right.

20     Q.     Any idea how much you billed him

21  so far?

22     A.     I think with expenses, airplane

23  fares and everything else about $5,000.

24     Q.     How many active cases do you have

25  presently that you are involved in from a

24

1    consulting standpoint?  And now I am

2    talking about cases in litigation.

3        A.    The accounts folder is behind my

4    desk, I could tell you.  Probably 15, 20.

5        Q.    What percentage of your income

6    over the last, let's say, three years has

7    been derived from consulting as opposed to

8    your -- and, again, I am talking about

9    forensics consulting, consulting on cases

10   in litigation -- as opposed to the other

11   work that you have described your various

12   entities do?

13       A.    In the neighborhood of 10

14   percent, somewhere around there.

15       Q.    Okay.

16       A.    Or less.

17       Q.    Have you ever been stricken as an

18   expert witness or excluded as an expert

19   witness?

20       A.    No, sir.

21       Q.    Have you ever been offered as an

22   expert witness in a case similar to this

23   one?  Do you know what I mean by "offered"?

24   Tendered.

25       A.    Yes.  With these exact

25

```
 1    circumstances, no.

 2        Q.      Have you ever testified as an

 3    expert witness, and I think I have an

 4    answer to this, but have you ever testified

 5    as an expert witness expressing opinions on

 6    similar subject matter as you are

 7    expressing in this case?

 8        A.      Parts of it, yes.

 9        Q.      Which parts?

10        A.      The handling of a shore wire, for

11    lack of a better word, by only one

12    individual.

13        Q.      Any other parts?

14        A.      No.

15        Q.      When did you render opinions

16    concerning the handling of a shore wire by

17    more than one individual, or by only one

18    individual, I think is what you said.

19        A.      I believe it was a few cases ago.

20    A few cases in the past.

21        Q.      If you look at your list, would

22    that help you?

23        A.      No.  They didn't go to court.

24    They settled it.

25        Q.      Okay.  Do you remember which
```

26

1    lawyers you were working with, the names of

2    the cases, anything like that?

3         A.     Well, I am working with one right

4    now with John Young.

5         Q.     All right, let's start with John

6    Young's case.  Tell me what specifically is

7    involved in that case.

8         A.     It's a deckhand.  There was a tow

9    of barges coming in looking for the shore

10   wire to hook up.

11        Q.     And in that case, the shore wire

12   was a wire that was attached to a deadman

13   and probably had sunk down in the water and

14   he had to somehow pull it out.  Am I close?

15        A.     He had to pull it up with a spike

16   pole by himself at night, yes, sir.

17        Q.     I have had that case before.

18        A.     That's a current case.

19        Q.     Okay.

20        A.     I will be rendering that opinion.

21   I haven't rendered it yet.

22        Q.     Who is the lawyer on the other

23   side of that, do you know?

24        A.     Someone from Burke & Meyer.

25        Q.     And you have not given a

27

1   deposition yet in that case?

2       A.    No.

3       Q.    Have you issued a report yet in

4   that case?

5       A.    No.  It's due by the end of this

6   week, by next week.

7       Q.    Do you know the plaintiff's name

8   in the case?

9       A.    Josh Blessy -- no, Josh Levins

10  versus Blessy Marine.

11      Q.    Blessy Marine would be the

12  defendant?

13      A.    Yes.

14      Q.    Any other cases where you have

15  rendered opinions similar to those set

16  forth in your report in this case?

17      A.    I don't remember the names, but

18  it was the same situation.

19      Q.    But that is the only similar

20  opinion --

21      A.    Yes, sir.

22      Q.    -- involving a shore wire.  And

23  has your opinion been consistent in all

24  those cases?

25      A.    Yes, sir.

28

1          Q.      What is your opinion with respect

2     to the handling of a shore wire by only one

3     employee?

4          A.      It requires two men to do it

5     safely.

6          Q.      What is the rationale for that

7     opinion?  What is the reasoning for that?

8          A.      Well, the weight of the wire, the

9     way they have to take it out of the water,

10    and the ability to handle wires safely and

11    put it over a cable or a timberhead

12    requires the use of two people to do it

13    properly and safely.

14         Q.      Tell me, Mr. Campana, first of

15    all, you shared with me today your file.

16    And what I would like you to do, if you

17    would, is just go through and tell me what

18    the contents of your file would be.  And

19    obviously what I am asking you to do is if

20    there is a deposition, tell me whose

21    deposition it is; if it is a document, tell

22    me what it is.  And what I want to find out

23    is what the contents of your file would be.

24         A.      I have Mr. Teddy Nichols'

25    deposition from July 10, 2002.

29

```
 1              Mr. Timothy Ramey's deposition

 2    taken on July 10, 2002.

 3              I have Mr. Mark Clay's deposition

 4    taken July 30, 2002.

 5              Mr. Charles Johnson's deposition

 6    taken February 12, 2003.

 7              Mr.  Michael Weisend's

 8    deposition, W-e-i-s-e-n-d, on July 30,

 9    2002.

10              Mr. Mark Clay's deposition,

11    again, taken February 12th.

12              A note from to Mr. Powers showing

13    the Philip Sporn Plant barge stowage for

14    standard barges and fleet diagrams.

15              Defendant's third supplementary

16    disclosure of expert testimony.

17              A report prepared by Mark G.

18    Strauss, Ph.D. for Mr. Powers dated March

19    12th.

20              I have United States Coast Guard

21    information pulled off the Internet, PSIX

22    exchange on the LAKIN TERMINAL.

23              Letters from Mr. Baun to me.

24              Plaintiff's mediation -- no.

25    This is yours.
```

1        Q.     No, I think that's yours.   That

2   came out of your file.   Plaintiff's

3   mediation summary, is that what that is?

4        A.     That's what it says.

5        Q.     Okay, you don't remember having

6   that in your file?

7        A.     No.

8               THE WITNESS:

9                     Did you stick it in there

10  by chance this morning or did you leave it

11  on my desk?

12              MR. POWERS:

13                    No.

14              MR. BAUN:

15                    I might have brought it

16  down.

17              THE WITNESS:

18                    I didn't see it.

19              MR. POWERS:

20                    Okay, that's fine.

21              THE WITNESS:

22                    The deposition of Steve

23  Edens taken November 26, 2002.

24                    The report from the

25  University of Michigan from Gary D. Herrin,

1   Ph.D. dated January 19th to Mr. Baun.

2                        Deposition of Jeff Darst

3   taken February 12, 2003.

4                        Another deposition of

5   Mr. Teddy Nichols taken February 12, 2003.

6                        My report, I have my

7   photos, the photos that your office sent to

8   me yesterday and the videotape which I

9   haven't seen, and my video.

10  EXAMINATION BY MR. POWERS:

11      Q.     All right, the videotape that you

12  have not seen is the one that I sent you?

13      A.     Yes, sir.

14      Q.     And you received that yesterday

15  in your office?

16      A.     Yes.

17      Q.     Then the photos that you have

18  seen, that also came yesterday?

19      A.     That came yesterday.  I saw those

20  this morning.

21      Q.     Do you have a curriculum vitae

22  here with you today?

23      A.     That's attached to my report.  I

24  can print another one out.

25      Q.     Well, here's why I'm asking.  I

32

```
 1    am trying to figure out where I got this

 2    document.  Just bear with me one second.

 3              Is that an old curriculum vitae,

 4    the one I just handed you.

 5              And we can mark it if you want

 6    to.  I just want to figure out what I'm

 7    doing with it.

 8         A.   That's an old one from -- Yes, it

 9    hasn't been updated.  It doesn't have the

10    list of cases.

11         Q.   Right.  But it does have a

12    consulting agreement attached to it.

13              MR. BAUN:

14                   It sets forth the fees.

15              MR. POWERS:

16                   Yes.

17              MR. BAUN:

18                   And where you would have

19    gotten that is on my initial identification

20    of experts I would have sent whatever.  Pat

21    was working for me at the time, my

22    secretary, and she would have sent whatever

23    curriculum vitae she had at her desk, which

24    is probably the old one.

25              MR. POWERS:
```

33

```
 1                      All right.

 2      EXAMINATION BY MR. POWERS:

 3          Q.    Let's do this.  You said your

 4      report has a current CV attached to it?

 5          A.    Yes.

 6          Q.    And list of cases?

 7          A.    Let's see.  I can tell you in one

 8      second because I think --

 9          Q.    What I was provided was a 12-page

10      report that includes a curriculum vitae.

11      Is that right?

12          A.    That's it.

13          Q.    Okay.  Do you have an extra copy

14      of that or can we have a copy made to

15      attach?  Because I am going to refer to it

16      and I would like to have it attached to the

17      deposition.

18          A.    Sure, no problem.

19          Q.    All right, can we use that one?

20          A.    Yes.

21              MR. POWERS:

22                      Let's mark that Exhibit 1,

23      and what we are making as Exhibit 1 is --

24      EXAMINATION BY MR. POWERS:

25          Q.    It says it is a preliminary
```

34

1    report dated December 20, 2003; is that

2    right?

3         A.    Yes.

4         Q.    Are there any other reports?

5         A.    No.

6         Q.    Any drafts?

7         A.    No.

8         Q.    So this is the final report in

9    this case?

10        A.    Unless I am asked to write

11   something additional, yes.

12             MR. BAUN:

13                  Based on discussions we

14   have had in terms of the stipulation of

15   facts and the fact that I have just now

16   received photos and videos from

17   Mr. Strauss, his inspection and report,

18   there may be amendments or additions, but

19   you will receive those very quickly.

20             MR. POWERS:

21                  But this is the latest

22   word from Ron Campana, Exhibit 1, okay.

23   EXAMINATION BY MR. POWERS:

24        Q.    And what you are saying is you

25   may be asked to do something else, and if

35

1    you are, you are going to do it; correct?

2         A.      Correct.

3         Q.      Have you recommended any

4    additional investigation or anything else

5    to be done?

6         A.      The only thing I recommended was,

7    after I saw the stipulations, getting

8    everyone to agree to what the correct

9    distance was.

10        Q.      Yes, I think we are going to take

11   care of that.  But that's it?

12        A.      That's it.

13             MR. POWERS:

14                      Okay, now, let's mark this

15   as Exhibit Number 2.

16             MR. BAUN:

17                      Is that his current

18   curriculum vitae?

19             MR. POWERS:

20                      No, that's the old one.

21             MR. BAUN:

22                      Okay.

23   EXAMINATION BY MR. POWERS:

24        Q.      Now, this Exhibit 2 has a

25   consulting agreement as part of it.  Did

36

1      you enter into a consulting agreement with

2      Mr. Baun in this case?

3          A.      No.

4          Q.      There is no written agreement

5      such as the one attached there?

6          A.      No.  This is an old one.

7          Q.      Yes.  And I noticed that the

8      rates are different so I assumed it was an

9      old one.

10         A.      This is from my old address, too.

11     This is over five years old.

12         Q.      Well, it looks like it's got a

13     fax on it from '99, so I don't doubt your

14     word on that at all.

15         A.      Okay.

16         Q.      But my only --

17             MR. BAUN:

18                     My apologies.  I have to

19     update my secretary's document.

20             MR. POWERS:

21                     Well, that's okay.  I'm

22     not criticizing you either, but my only

23     purpose in making this an exhibit is I

24     wanted to find out is there a written

25     consulting agreement in this case.

37

1    EXAMINATION BY MR. POWERS:

2         Q.    And your answer is no?

3         A.    Correct.

4         Q.    Okay.  Tell me what it is that

5    you were asked to do in this case, please.

6         A.    To review the information, visit

7    the Sporn Power Plant and render an opinion

8    if I thought that the operation that was

9    taking place was done in a professional,

10   safe method and if the operation that took

11   place and the injuries that occurred to

12   Mr. Nichols can be attributed to the

13   operations that were taking place as

14   alleged.

15        Q.    Okay.  Your -- Actually, before

16   we get to your report let me just ask you

17   this:  You have licenses listed on your

18   curriculum vitae.  And my question, I think

19   we went through this in the ELAINE G case,

20   but as I understand it, you have not been

21   employed as a master or member of a crew of

22   a vessel for quite some time; is that a

23   fair statement?

24        A.    Yes, sir.

25        Q.    Tell me when the last time you

38

1    would have been employed as a master or a

2    crew member aboard a navigable vessel would

3    have been.

4         A.    19 -- March 31, 1981.

5         Q.    And you have never been either a

6    master or the member of a crew of a vessel

7    of the class of the LAKIN TERMINAL; is that

8    a fair statement?

9         A.    Well, no.  I was a mate on a

10   pushboat here in Louisiana.

11        Q.    When was that?

12        A.    1973.

13        Q.    What did that pushboat do?

14        A.    Moved barges from New Orleans to

15   Grand Isle, water barges.

16        Q.    Were you involved in the kinds of

17   duties that Mr. Nichols had as a deckhand

18   in this case?

19        A.    Yes.  I was a deckhand handling

20   wires, lines and everything else.

21        Q.    And in that capacity --

22        A.    Glorified deckhand.

23        Q.    Right.  Well, you had line

24   supervisory responsibility?  In other

25   words, you probably had a man or two under

39

1    you; right?

2        A.    I was a Kings Point graduate with

3    an unlimited license sailing as a deckhand

4    mate on a tugboat to earn money.

5        Q.    Underemployed, as they say.

6        A.    Well, the only jobs that were

7    available at the time.

8        Q.    Okay.  Were you involved in

9    spotting barges similar to what is

10   described in the testimony in this case?

11   Do you know what I mean by --

12       A.    I understand what you mean by

13   spotting barges.  Yes, we had to bring

14   barges to and from docks, yes.

15       Q.    Were you involved at all with

16   coal barges?

17       A.    No.

18       Q.    Were you delivering any barges to

19   unloading facilities similar to the Sporn

20   plant with its crane?

21       A.    No.

22       Q.    In looking at your report on Page

23   2, it lists documents that you say were

24   reviewed as part of your opinion.  And my

25   first question is, the documents that you

40

1    listed as part of your file, are those

2    documents all of the documents that you are

3    relying on in this case in order to form

4    the opinions and conclusions that you have

5    reached?

6         A.    And my visit to the Sporn Power

7    Plant, yes.

8         Q.    This list of documents on Page 2,

9    it seems to include some documents that are

10   not in your file.

11        A.    Let's see.

12        Q.    Maybe you can straighten me out

13   on this, but Number 8 says American

14   Electric Power files for Mr. Teddy Nichols.

15   I didn't see that in your file.  Is it

16   there and we missed it?

17        A.    It's possible there may be

18   something on my desk too, because I was

19   reviewing everything yesterday.

20        Q.    Is it fair to say that -- Well,

21   let me just ask you to what extent are you

22   relying on the American Electric Power

23   files for Teddy Nichols in rendering

24   opinions in this case?

25        A.    None.  I think it was just for

41

1    proof of employment.

2        Q.      What about item 9, the photocopy

3    of agreement between U. S. Steel Workers

4    and Indiana Michigan Power, and there are

5    pages listed there, 36, 37, 42, 43, 56 and

6    57.  I don't see those in your file.  And

7    so the point of my question is, are --

8    First, what are those pages; and, second,

9    are you relying on them in rendering

10   opinions in this case?

11       A.      No, I am not relying on those in

12   rendering opinions and --

13       Q.      Okay.  Number 10 is the Safety

14   Rule Book for American Power River

15   Transportation.  I know that in your report

16   you talked about one of those rules, at

17   least, but I don't see them in your file.

18   And let me say, I am not trying to trick

19   you.  It may be that they are attached to a

20   deposition or something that is in your

21   file, but let me just ask you:  Have you

22   reviewed the entire Safety Rule Book?

23       A.      No.

24       Q.      Is it fair to say that the

25   portions of the book that you have relied

42

1    on are the portions that are recorded in

2    your report?

3        A.    Yes.

4        Q.    So to the extent that the Safety

5    Rule Book required or contained other

6    provisions that might be inconsistent or

7    different than what you have cited in your

8    report, you haven't read them; is that

9    fair?

10       A.    I wouldn't know if it was

11   inconsistent or not without reading it,

12   yes.

13       Q.    But you would agree based on your

14   experience that a safety rule book applies

15   not only to the management of the company

16   that employs the individual, but to the

17   individual himself who is working on the

18   vessel?

19       A.    Yes.

20       Q.    Number 12 -- I'm sorry, Number

21   11, I'm sorry, Indiana Michigan Power

22   Company Water Transportation payroll

23   records.  I didn't see those here.  Are you

24   relying on those for any reason?

25       A.    No.

43

1        Q.      M/V LAKIN TERMINAL's vessel logs

2    August 27th, 28th and 29th.  I didn't see

3    those here.  Now, they may be attached to a

4    deposition, in fairness to you, but are you

5    relying on those specific documents for any

6    reason in particular?

7        A.      No.  They just generally confirm

8    that the vessel was working at Philip Sporn

9    Power Plant at the time.

10       Q.      And item 14, item 15 and item 16

11   are, or purport to be a report of accident,

12   a Pleasant Valley Hospital record and a

13   Family Urgent Care record.  First of all, I

14   don't see those here.  Are they in your

15   file?

16       A.      If I listed them, they were in my

17   file.

18       Q.      But they are not today?

19       A.      They may be in my office

20   somewhere.

21       Q.      All right.

22       A.      What I normally do, just for

23   clarification, stuff that really doesn't

24   pertain to me I separate.

25       Q.      So 14, 15 and 16 would be things

44

1    that really don't pertain to you and you

2    are not relying on them?

3         A.    I am not rendering any opinions

4    on medical issues or anything like that.

5         Q.    Okay.  Nos. 17, 18 and 19 are an

6    accident and injury reporting form, letters

7    and reports from Dr. McCleary, and 19 is

8    letters with certain dates from McCleary to

9    Todd, Dr. McCleary to Dr. Todd.  I don't

10   see those in your file and you are not

11   relying on those; is that a fair statement?

12        A.    Yes.

13        Q.    And you list the inspection of

14   the Philip Sporn Plant on September 25,

15   2003.  That is the inspection that I have

16   just looked at on the video.

17        A.    Correct.

18        Q.    And the video that I looked at is

19   a video that you took?

20        A.    Yes.

21        Q.    There was a professional

22   videographer there, I'm told.  Have you

23   seen that video?

24        A.    No.

25        Q.    Okay.  The drawings of the cell

1   and fleet arrangements listed as Number 21,

2   is that what was faxed to me this --

3        A.     I believe so, yes.

4               MR. BAUN:

5                    You mean by --

6               MR. POWERS:

7                    Okay.  I just committed --

8   Well, first of all, I just pointed to the

9   stipulation.  Is it the drawings that were

10  attached to the stipulation?

11              MR. BAUN:

12                   But there was --

13              MR. POWERS:

14                   There was another thing,

15  too.

16              THE WITNESS:

17                   Right; there was a letter

18  from them that said, "Todd, this appears to

19  be the fleet diagram."

20              MR. POWERS:

21                   Yes; right, okay.

22              MR. BAUN:

23                   But if you decided that of

24  the --  There were like three or four

25  diagrams that were sent to you, but you

46

1    said to me there were only one or two that

2    really --

3                THE WITNESS:

4                        Right; some of them were

5    other --

6                MR. BAUN:

7                        Just fleet diagrams?

8                THE WITNESS:

9                        Right.

10    EXAMINATION BY MR. POWERS:

11        Q.    And then 22 is the videotape

12    labeled "Barge Handler/Dockhand Safety

13    Training," and that is, I think, this

14    (indicating)?

15                MR. BAUN:

16                        No.  That's the one you

17    just gave me.

18                MR. POWERS:

19                        Oh, I'm sorry.

20                        But it was in your file.

21    I saw it.

22                THE WITNESS:

23                        It may be just on my desk.

24                MR. BAUN:

25                        It's here somewhere.

47

```
 1            MR. POWERS:

 2                    It's here somewhere.

 3            THE WITNESS:

 4                    Right here (indicating).

 5            MR. POWERS:

 6                    Okay.

 7    EXAMINATION BY MR. POWERS:

 8        Q.    Did you review that?

 9        A.    Yes.

10        Q.    And I think you reference that in

11    your report.

12        A.    Correct.

13        Q.    Now, have we clarified and listed

14    everything that you have reviewed and

15    relied on in this case?

16        A.    Yes.

17        Q.    Okay.  Let's talk about the

18    inspection for a second.

19               I looked at the video of the

20    inspection, and in reviewing the video,

21    and, of course, I have been there and I

22    have seen the operation take place, what is

23    it that you saw during the investigation or

24    learned that bears upon your opinions in

25    this case?
```

48

1          A.      That the entire manner and the

2    method that they do it is not necessary.

3    It's improper and dangerous.

4          Q.      And I think you have said that in

5    your report; is that fair?

6          A.      Yes.

7          Q.      Have you described your opinion

8    with regard to the safety issues presented

9    as you saw in the investigation, in the

10   inspection, have you listed those

11   completely in your report?

12         A.      I believe so.

13         Q.      Is there anything else that

14   occurred at the inspection that you are

15   relying on?  One of the things I noted is

16   that you said in your report that the tests

17   conducted on September 25, 2003, showed a

18   shock load on a deckhand handling the wire

19   to be at least 180 pounds.  That's on Page

20   5 of your report?

21         A.      Yes.

22         Q.      Where did you get that

23   information?

24         A.      From the test that was done with

25   Dr. Herrin, isn't it?

49

```
 1            MR. BAUN:

 2                    Yes.

 3    EXAMINATION BY MR. POWERS:

 4        Q.    Did you witness the test?

 5        A.    Yes.

 6        Q.    Have you read his report?

 7        A.    Yes.  I think he said 178.  I

 8    thought it said 180.

 9        Q.    You are relying on the testing

10    that he did in listing this -- Specifically

11    with regard to the statement that I just

12    read, you are relying completely on what

13    Herrin did?

14        A.    What we witnessed and what he

15    recorded, yes.

16        Q.    Okay.  When you say "shock load"

17    what does that mean?

18        A.    Shock load means in this

19    particular case the effect of the wire, the

20    rope/wire combination coming off the corner

21    of the empty barge and being allowed to

22    fall to the loaded barge, that height

23    differential with the weight of the wire is

24    what I call the shock load.

25        Q.    And at what stage of the process
```

50

1    would that occur?

2        A.    In the hand-off between the

3    deckhand on the light to the deckhand on

4    the loaded.

5        Q.    All right.  I watched the video

6    and I saw the deckhand hand a soft line

7    with an eye from the empty barge down to

8    the load.

9             MR. BAUN:

10                    Could I just ask for a

11   clarification as to which video.

12            MR. POWERS:

13                    Sure.

14   EXAMINATION BY MR. POWERS:

15       Q.    I am talking about your video.

16       A.    My video doesn't depict that.

17       Q.    Well, I just watched it.

18       A.    Well, I know, but it doesn't show

19   the small line, the protective line

20   breaking and the line going -- and the wire

21   going into the river.

22       Q.    Okay.

23       A.    It was taken --

24       Q.    Well, let me back up for a

25   second.  Here is what I did see, and we can

1    play it.  It's not very long.

2        A.    Yes.

3        Q.    But what I did see is a long view

4    of a deckhand handing a soft line with an

5    eye attached to a wire from an empty barge

6    down to a load.

7        A.    Correct.

8        Q.    And you filmed that?

9        A.    Yes.

10       Q.    And you witnessed that when you

11   were there?

12       A.    Yes.

13       Q.    When that was done I didn't see

14   the wire fall off the corner, and I didn't

15   see a, quote, shock load being received by

16   the individual on the loaded barge.  And my

17   question is, did that occur during the time

18   that those two deckhands were performing

19   that task at the time of your inspection?

20       A.    Yes.  What you saw was the first

21   attempt which the -- I don't know the

22   proper word for the device that measures

23   the pull --

24       Q.    Yes.

25       A.    -- wasn't hooked right.

52

1        Q.      Okay.

2        A.      So they redid it.

3        Q.      Yes.  You and I are missing each

4   other, I think.

5        A.      Okay.

6        Q.      But I am talking about initially,

7   meaning before the tensiometer or whatever

8   it's called, tension meter or whatever the

9   heck it is, before the measuring device was

10  even brought out, I believe the video shows

11  a deckhand, or two deckhands involved in

12  this process.

13       A.      You're correct.

14       Q.      Okay, now, my question is whether

15  I am correct that there was no shock load

16  on that pass of the line.  The wire didn't

17  fall off the corner, there was a smooth

18  hand-off, and the 180-pound shock load that

19  you are describing didn't occur at least on

20  that particular hand-off.

21       A.      Correct.

22       Q.      Okay.  Have you investigated or

23  reached any conclusions as to how often the

24  shock load that you are talking about, in

25  other words -- and I am going to say "shock

53

1    load" because it is easier than saying the

2    wire falling off the corner, but do you

3    know what we're talking about?

4        A.    Yes.

5        Q.    Have you done any investigation

6    or have you attempted to ascertain or

7    rendered an opinion as to how often that

8    would happen in the operation at the Sporn

9    plant?

10       A.    The only thing I can base it on

11   is the three people who testified in

12   depositions, Mr. Ramey, Mr. Nichols and the

13   crane operator.

14       Q.    Yes, Johnson.

15       A.    Johnson, who said -- Between the

16   three of them they said it happens quite

17   frequently.

18       Q.    So that I understand, you are

19   interpreting the depositions of Johnson,

20   Ramey and the plaintiff when they say from

21   time to time they would get jerked by a

22   lack of slack.  That is what they said in

23   their depositions, is it not, that there

24   wasn't sufficient slack --

25       A.    They attributed the lack of slack

54

1    to being jerked.

2        Q.    Right.  And what you are telling

3    me is that you interpret that to mean that

4    the wire has come off the corner of the

5    empty barge, fallen, and that fall has

6    caused a shock load as described in your

7    report?

8        A.    Well, it's a little bit more

9    detailed than that.  Mr. Ramey describes in

10   his deposition how he would hand the soft

11   line to Mr. Nichols, and then he says once

12   he grabbed hold of it he let go.

13       Q.    Right.

14       A.    Well, if he lets go, it has to

15   fall.

16       Q.    Yes.  It either falls to the deck

17   of the empty or it falls somewhere else,

18   but it is going to fall?

19       A.    It's going to fall.

20       Q.    Right, okay.

21       A.    And that is initially what --

22   well, not initially, on the second try that

23   is what we measured.  And it wasn't quite

24   the full seven, eight-foot height.

25       Q.    Now, you are talking about when

55

1     the meter was used on the video?

2          A.     Yes.

3          Q.     I did not see the second try, did

4     I?  You did not videotape that, did you?

5          A.     No, I did not.

6          Q.     Why not?

7          A.     Because I got more involved with

8     helping them -- Gary was involved in trying

9     to tie it, and I didn't know if he knew how

10    to tie a knot properly.

11              MR. BAUN:

12                    Thank you very much.

13              THE WITNESS:

14                    Then I found out he did.

15              MR. POWERS:

16                    I wouldn't, so that was a

17    good suspicion to have.

18    EXAMINATION BY MR. POWERS:

19         Q.     Have you seen any video or

20    photograph of the second try that rendered

21    the 178 pounds?

22         A.     No.

23         Q.     Do I understand that what the

24    second try involved was you connect --

25    There was this meter, whatever, and I don't

56

```
 1    know what they call it, but there was a

 2    meter, a measuring device of some kind

 3    attached to the wire.  Is that --

 4         A.     Attached to the -- where the rope

 5    meets the wire, yes.

 6         Q.     All right, but to the wire, not

 7    the rope?

 8         A.     Correct.

 9         Q.     And what was the other end

10    attached to?

11         A.     The timberhead, I believe.

12         Q.     And then the wire was thrown off

13    the empty?

14         A.     Basically.

15         Q.     All right.

16         A.     Actually, it was just let go.  It

17    was just let go into the river.

18              MR. BAUN:

19                    I would like to object

20    about the throwing --

21              MR. POWERS:

22                    Well, I didn't

23    intentionally put throwing off.

24              THE WITNESS:

25                    No, I understand, but it
```

57

1    was simply let go into the river so the

2    force, the pull of the wire would be

3    measured.

4              MR. POWERS:

5                   Okay.

6    EXAMINATION BY MR. POWERS:

7        Q.    And that measurement of 178

8    pounds is what you are describing in your

9    report, what you say is 180 rounding off?

10       A.    I don't have my reading glasses.

11   Yes.

12       Q.    Do you think it would make any

13   difference if the meter that we are talking

14   about was attached to the line as opposed

15   to the wire in terms of the measurement of

16   the tension?

17       A.    I don't honestly know.

18       Q.    Do you know why it is that

19   someone didn't just hold on to the meter as

20   Nichols or Ramey or a deckhand would be

21   holding on to the soft end of the line when

22   the wires dropped and the shock load is

23   supposedly incurred?

24       A.    For safety.  We didn't want to

25   injure somebody else.

1          MR. BAUN:

2                    I was just going to say

3     that.  I don't think anybody wanted to hold

4     it.

5     EXAMINATION BY MR. POWERS:

6          Q.     Let me just ask you:  Do you have

7     an opinion as to whether a deckhand could

8     actually hold on to a line and withstand

9     180 pounds of shock load without either

10    being pulled over or dropping the line in

11    the water?

12         A.     There's a lot of variables

13    involved.  I would say the average person

14    would either drop it or get pulled into the

15    river.

16         Q.     Are you aware of any incident in

17    the entire history of this plant where an

18    employee has been pulled into the river?

19         A.     No.

20         Q.     Are you aware of any incident

21    where this alleged shock load caused an

22    employee to fall down and become injured

23    prior to Mr. Nichols?

24         A.     No.

25         Q.     You said that back in the '70s

59

1    you worked as a deckhand on a pushboat.

2    And I take it -- Let me just try to ask it

3    this way.  You have been obviously around

4    boats and operationally around boats until

5    what, 1981?

6        A.    Yes.

7        Q.    You have seen deckhands doing

8    their work; right?

9        A.    Correct.

10        Q.    And when you were at this

11    investigation you saw deckhands putting

12    face wires on the boat?

13        A.    Yes.

14        Q.    How long are the face wires?

15            MR. BAUN:

16                    Well, I would object.

17            MR. POWERS:

18                    Well, strike that.

19    EXAMINATION BY MR. POWERS:

20        Q.    How long were the face wires on

21    the LAKIN TERMINAL, if you know?

22        A.    I don't know.  They were

23    connected to the winches.

24        Q.    Right.  Do you know what typical

25    face wires measure on either harbor boats

60

```
 1    such as the LAKIN TERMINAL or line hold
 2    boats such as some of the larger AB boats?
 3         A.    I believe they are 90 footers.
 4         Q.    And I was watching the video and
 5    I saw the deckhand placing the face wire by
 6    himself on a timberhead.  Do you have a
 7    criticism of that?
 8         A.    No.
 9         Q.    Do you know how much force -- I
10    don't know what else to call it -- do you
11    have any idea how much force potentially
12    can be applied to a deckhand holding on to
13    a face wire should the boat fall away from
14    the barge or otherwise pull the deckhand?
15              MR. BAUN:
16                        I guess I am going to have
17    to object to --
18              MR. POWERS:
19                        Yes.  That's a terrible
20    question.  Let me try it again.
21    EXAMINATION BY MR. POWERS:
22         Q.    I am talking about the face wire
23    operation.
24         A.    Yes, sir.
25         Q.    You have a single deckhand, and
```

61

1     what he is doing, and you can put this in

2     your mind, I think, as well as the rest of

3     us, he is facing the towboat.  He's got a

4     timberhead in front of him.  He is pulling

5     the slack out of the face wire and he's

6     going to put it on this timberhead; right?

7     Are you with me so far?

8          A.     Correct.  But it doesn't work

9     like that all the time.

10          Q.     All right, but I am going to ask

11     you to assume that it works that way at

12     least some of the time.

13          A.     Okay.

14          Q.     There are various scenarios in

15     which a deckhand under those circumstances

16     could become injured; and you would agree

17     with that?

18          A.     Yes.

19          Q.     And there are various things that

20     can go wrong in that operation, including

21     current, and the boat not coming ahead

22     adequately could cause the boat to drift

23     away from the barge, the barge could be

24     bounced forward.  There could be forces

25     applied that would cause the wire to pull

62

1    the deckhand.

2         A.    Correct.

3         Q.    You agree with that?

4         A.    Yes, sir.

5         Q.    Have you investigated, or to your

6    knowledge has anyone on behalf of the

7    plaintiff investigated what the relative

8    forces are at play in those kinds of

9    operations as compared to the operation

10   that you are criticizing in this case?

11        A.    No, with the caveat it is two

12   separate and complete different operations.

13        Q.    Okay.  Have you ever made tow?

14        A.    Yes.

15        Q.    Then you are aware of what is

16   involved in pulling slack out of fore and

17   aft wires?

18        A.    Yes.

19        Q.    Putting the eye of the wire or

20   link into a pelican hook and using a

21   cheater bar to tighten it down?

22        A.    Right.

23        Q.    Do you have any idea of the

24   amount of stress, the force that is

25   involved in performing that work as it

1    would compare to the forces that are

2    described in your report and Mr. Herrin's

3    report?

4        A.    No.  Once again, it is two

5    separate and distinct operations in making

6    tow to use two deckhands and when you only

7    use one.

8        Q.    Okay.  You testified earlier that

9    you are involved in a case with Mr. Young

10   where an employee injured his back pulling

11   a shore wire out of the water?

12       A.    Correct.

13       Q.    Any idea of the forces at play in

14   pulling that wire out of the water as it

15   would compare to the shock load that was

16   measured in this case?

17       A.    Once again, it was something

18   different.  The tug dropped off.

19       Q.    The tug dropped off and pulled

20   him; right?

21       A.    Yes.

22       Q.    And that is another potential

23   hazard for a seaman; isn't it?

24       A.    Yes.

25       Q.    And that would apply some kind of

64

1   force to that deckhand as the tug dropped

2   away; correct?

3        A.      Correct.

4        Q.      I take it you are critical of the

5   tug operator, the pilot in allowing that to

6   happen?

7        A.      Well, the tug operator, the lack

8   of a radio, and the fact that there weren't

9   two deckhands.

10       Q.      You refer to the safety video on

11  Page 4, and you say that the procedure used

12  at the Sporn plant is not mentioned and

13  described in that safety video; is that a

14  fair summary of what you say about that

15  video?

16       A.      For the wire hooked up to the

17  barges, yes.

18       Q.      Okay.  And do you know whether

19  this safety video was intended to train

20  individuals as to how to do their job at

21  the Sporn plant?

22       A.      Yes.  It was the safety director,

23  I forget his name.

24       Q.      Mr. Weisend.

25       A.      Mr. Weisend testified that after

65

1    observing the operation, he decided he had

2    to make a video.  And I found it strange

3    that he would use a different terminal to

4    make a video for this terminal, which is a

5    completely different operation.

6         Q.     How long had Mr. Nichols been

7    performing this job?  And by "this job" I

8    mean the job at the Sporn plant.

9         A.     Well, refresh my memory.  I know

10   he's done it but I don't know exactly how

11   long.

12        Q.     Okay.  I am going to suggest to

13   you that it is in his deposition, and we

14   can look, this isn't a memory test.

15        A.     Right.

16        Q.     But if he were doing it five

17   years, for instance, the duties for which

18   he would be responsible are something, you

19   would agree with me, that could be trained

20   through on-the-job training in that period

21   of time for someone of average

22   intelligence?

23             MR. BAUN:

24                  You are saying "could be"?

25             MR. POWERS:

66

```
 1                  Yes.

 2            MR. BAUN:

 3                  Okay.

 4     EXAMINATION BY MR. POWERS:

 5       Q.     And more specifically my question

 6     is, would you agree with me that someone of

 7     average intelligence should be able to

 8     learn how to perform the tasks which were

 9     required of Mr. Nichols at the Sporn plant

10     through on-the-job training through someone

11     showing them physically how to do the job?

12       A.     I would agree with that.  But I

13     would also agree that what they were being

14     told and trained to do was not safe.

15       Q.     Well, you have said that in your

16     report.

17       A.     Right.

18       Q.     But I am simply trying to, for

19     the moment, you have criticized the

20     training because the video doesn't show the

21     proper procedure.

22       A.     Understood.  But I am not going

23     to have my testimony reflect the fact that

24     just because he was trained to do something

25     for five years that he was trained
```

67

1    properly.

2         Q.     I understand that.

3         A.     Okay.

4         Q.     But --

5         A.     Yes.  Anyone with intelligence

6    can be trained over five years to do

7    something properly.

8         Q.     All right.

9         A.     If the training procedure is

10   proper in the first place.

11        Q.     Regardless of what video he might

12   have been shown when he was hired?

13        A.     Right.

14        Q.     Okay.  Now, on Page 5 of your

15   report, you say --

16             MR. BAUN:

17                  Could we just take a quick

18   break?

19             MR. POWERS:

20                  Yes.

21             MR. BAUN:

22                  I'll be right back.  In

23   fact, why don't you just keep going.

24                  (OFF THE RECORD)

25             MR. POWERS:

68

```
 1                    Back on the record.

 2    EXAMINATION BY MR. POWERS:

 3         Q.    On Page 5 of your report, on your

 4    Summary of Facts and Opinions, first of

 5    all, this is captioned, "Summary of Facts

 6    and Opinions," and then there is Number 1

 7    in bold letters, Number 2, and then there

 8    is a sentence in bold letters, and those

 9    are, in fact, a summary of your opinions;

10    correct?

11         A.    Correct.

12         Q.    Now, you say under (1)(a) that

13    deckhands are require to handle a wire in

14    excess of 35 feet and that that -- What I

15    am reading here is you think that violates

16    the safety manual?

17         A.    Correct.

18         Q.    You don't have the safety manual

19    here, do you?

20         A.    I have it somewhere.

21         Q.    All right.

22         A.    Not the manual; excerpts of it.

23              MR. POWERS:

24                    Let me see.  Do you have

25    it?  Because I don't either.
```

69

1            Oh, here it is, never

2      mind.

3      EXAMINATION BY MR. POWERS:

4          Q.      Over on Page 6 of your report --

5          A.      Right.

6          Q.      On your "Lifting And Carrying,"

7      you cite Page 12 of the Safety Rule Book.

8      It says, "Barge wires over 35 feet in

9      length must be lifted or carried" -- and

10     then you left a word out, I think, "by" --

11     "at least two workers."  And that's the

12     rule that you are referring to?

13         A.      Correct.

14         Q.      And you believe that that was

15     violated in this case?

16         A.      Yes.  Even though it refers to

17     the fleet wires, the reason it's there is

18     the weight factor.

19         Q.      Right.  Well, obviously a barge

20     wire is not a fleet wire and it's not a

21     pullout cable.  A barge wire is a very

22     specific wire; isn't it?

23         A.      Yes, a barge wire is a very

24     specific wire, and the barge wires are very

25     similar in the weight factor as the pullout

70

1    cable.

2         Q.      Right.  But you would agree with

3    me that if the safety rules are referring

4    to barge wires, what they are referring to

5    is wires used to build tow, which would be

6    typically 30 feet, 35 feet and longer

7    portable wires that are carried out onto

8    the tow?

9         A.      Well, what they are referring to

10   is for a reference, a weight factor.

11        Q.      All right.

12        A.      And you are not supposed to pick

13   up wires greater than 35 feet in length

14   because of the weight factor.

15        Q.      I understand your opinion and I

16   appreciate it.  I just want to make sure

17   that I've got this right.  You agree with

18   me that a barge wire is a specific kind of

19   wire?

20        A.      Yes.

21        Q.      Okay.  And this soft line that

22   was attached to the pullout cable, that is

23   not a barge wire.  What was being handled

24   by Mr. Nichols was not a barge wire.  You

25   are simply saying by analogy if that is the

71

1    rule for a barge wire, it ought to apply to

2    this job?

3        A.    What I am saying is that the

4    Safety Rule Book referenced a specific wire

5    at 35 feet in length because of the weight

6    factor.

7        Q.    I understand.

8        A.    And anything in excess of that

9    weight factor --

10        Q.    By analogy?

11        A.    -- should not be lifted by more

12    than one person.

13        Q.    But you are using an analogy --

14        A.    Yes.

15        Q.    -- to get to that conclusion?

16        A.    Yes.

17        Q.    Okay.  (1)(b), you say that the

18    tug captain did not have a proper

19    understanding of how the barge hauling

20    cables worked because he believed the cable

21    had to be pulled slack by his tug.  In

22    fact, the LAKIN TERMINAL can create slack

23    in the wire by pulling it; isn't that

24    correct?

25        A.    Correct.

72

```
1          Q.    So where is his misunderstanding?

2          A.    No, no, he can't.  It's the --

3    The crane operator has to create slack.  He

4    thought it was a free-spooling deal.  It's

5    not.  It's under power.

6          Q.    But the fact of the matter is

7    from the standpoint of the tug pilot, once

8    there is slack created he still can use the

9    tug to pull the slack to make the job

10   easier for the deckhand?

11         A.    Yes, he can.

12         Q.    And, in fact, that is part of the

13   operation?

14         A.    That's what they do.

15         Q.    Okay.  He was wrong when he said

16   that it was a free-spooling effect, at

17   least as you read it, because you are not

18   going to spool the wire off of the winch by

19   virtue of the vessel?

20         A.    Right.  All I am saying here is

21   that he didn't have a proper understanding

22   of how it worked.

23         Q.    Okay.  You talk about the faulty

24   safety video on Page 6 under the caption

25   "Faulty Safety Video", and my question is,
```

73

1   do you agree with me that this lack of

2   information in the safety video did not

3   have anything to do with Nichols' injury?

4          A.      I would say I can't make that

5   statement.

6          Q.      Okay.

7          A.      Agreeing to what you said, for

8   the simple reason had the video, in my

9   opinion, been produced properly with the

10  proper way of doing it, Mr. Nichols upon

11  reviewing the video would have said, "Hey,

12  wait a minute, this is not what we're

13  doing."

14         Q.      I think what you are saying is,

15  and you say this in your report, there were

16  better ways to do this; right?

17         A.      Correct.

18         Q.      But my point is, if the video had

19  simply shown Nichols to do it the way he

20  was trained to do it and the way they were

21  doing it that day, it would not have made

22  any difference in this injury?

23         A.      Correct.

24         Q.      Okay.  So really what you are

25  saying and in criticizing the video, I

74

1     mean, I understand you are saying first of

2     all, it shows a different situation; but,

3     secondly, they should have used a different

4     process is what you are saying; correct?

5          A.      Second, yes.  And I am saying

6     that the manner and method which they

7     showed tying lines to the timberhead are

8     improper and dangerous.

9          Q.      Okay.  Assuming that the safety

10    video showed the Sporn plant and showed the

11    procedure that was involved in this case,

12    the way he was trained to do it by

13    on-the-job training and the way he was

14    doing it that day, it was not going to

15    prevent this accident?

16         A.      Correct.

17         Q.      Okay.  As I read your report you

18    are criticizing the way in which these

19    barges were being swapped out, for want of

20    a better term; am I right about that?

21         A.      Yes, sir.

22         Q.      And you are suggesting that there

23    might have been -- I think you give two

24    different methods but, again, correct me if

25    I am wrong, but I think I read two

1    different methods.  One was -- Well, why

2    don't you just tell me what they are.  What

3    are the methods that should have been used

4    to remove an empty and bring a load in?

5        A.    The simplest way to do it is once

6    the barge is empty the tug comes up behind

7    it and removes the fleet wires, removes the

8    haul-out cables and just simply pushes it

9    up a cell, a cell and one half.  That's it.

10   Ties it off, drops it back down.  We would

11   already have another load pre-positioned at

12   the lower end, pick it up and slide it in.

13       Q.    All right.  And using that

14   method, would you agree with me that one

15   deckhand could safely perform that task?

16       A.    You would have two deckhands, one

17   on each end or one together.  But what

18   would happen is the haul-out cables, when

19   they took more, if you would have two

20   deckhands working together the haul-out

21   cables would come off the timberheads and

22   be placed right on the cell.  So two

23   deckhands handle the wire.  It's unsafe,

24   it's inefficient and probably just as much

25   time would take place, maybe a few minutes

76

1   more.

2        Q.     All right.  So what you are

3   suggesting is that they are both on the

4   empty and they take the upriver -- I don't

5   know if that's upriver actually -- yes, I

6   guess it is, the upriver --

7        A.     They would take the downriver end

8   first.

9        Q.     Yes.  They take the downriver end

10  first and then they take the upriver end

11  and they simply push the barge forward?

12       A.     Correct.

13       Q.     Tie it off up in that area --

14       A.     Right.

15       Q.     -- and then bring the load in and

16  go back and get on the empty and take it to

17  the empty fleet?

18       A.     Well, we already have the load

19  in.  The load would be -- Okay, either way.

20  Either the load is in the fleet or if they

21  wanted to even expedite it, since they are

22  waiting, doing basically nothing while the

23  barge is being unloaded, bring another load

24  in to the lower cells into position, just

25  slide it in.

77

1      Q.      That is one way that you say this

2   job would be safer?

3      A.      Right.

4      Q.      Is there another way?

5      A.      Yes.   Use two tugs.

6      Q.      Explain that.

7      A.      One tug grabs the empty and one

8   tug takes the load, if they are in that

9   much of a hurry.

10      Q.      In your Conclusions on Page 7,

11   you say, "The Owners, Operators and Captain

12   of the tugboat LAKIN TERMINAL failed to

13   provide Mr. Teddy Nichols with a safe place

14   to work."  Are your reasons for stating

15   that completely set forth in the report?

16      A.      I believe so.

17      Q.      The next conclusion we have

18   already talked about, the length of the

19   wire being handled by the deckhand/dock

20   worker were in violation of the safety rule

21   book.  We have talked about that.

22          And then it says complaints about

23   this were ignored.  What complaints?  Who

24   made them and when?

25      A.      In the depositions of Mr. Ramey,

1    Mr. Nichols and --

2              MR. BAUN:

3                      Mr. Johnson.

4              THE WITNESS:

5                      -- Mr. Johnson, they said

6    over the past they complained numerous

7    times and they were ignored.

8    EXAMINATION BY MR. POWERS:

9        Q.    So you are relying upon that

10   deposition testimony for saying these

11   complaints were ignored?

12       A.    From those three separate

13   individuals.

14       Q.    No other source of information on

15   that?

16       A.    Correct.

17       Q.    One, two, three, four, five

18   conclusions down you say that AEP failed to

19   undertake standard periodic inspection of

20   their equipment.

21              What do you mean by that?

22       A.    If they had done a thorough

23   investigation of this policy and procedure

24   and looked at their equipment being

25   involved, they would have realized that the

79

1    wires being asked to be handled were too

2    heavy for one man.

3        Q.    I'm sorry.  Just say that one

4    more time.

5        A.    It relates to the length of the

6    wire and the weight of the wire, so a

7    normal inspection of what takes place, in

8    that context.

9        Q.    In other words, here's what I

10   think you are saying and correct me if I am

11   wrong, you are saying if anybody had taken

12   a hard look at this, they would have seen

13   that there was something dangerous going

14   on?

15       A.    Yes.

16       Q.    You say that AEP and M/V LAKIN

17   TERMINAL violated the provisions of the

18   American Waterway Operators Guideline.  Is

19   that the Responsible Carrier Program?

20       A.    Yes.

21       Q.    Do you know whether there was an

22   audit of this procedure by the Responsible

23   Carrier Program?

24       A.    No, I don't.

25                MR. POWERS:

80

```
 1                     I don't have any further
 2    questions.
 3             MR. BAUN:
 4                         I have a question.
 5                     (OFF THE RECORD)
 6             MR. POWERS:
 7                     I want to ask just a
 8    couple of more questions, and I apologize.
 9    EXAMINATION BY MR. POWERS:
10        Q.    First, there are some photos here
11    that I want to mark collectively as Exhibit
12    3, and those are photos that you took at
13    the inspection; correct?
14        A.    Correct.
15        Q.    At the time that you were there
16    for the inspection, do you recall whether
17    they were standard or jumbo barges being
18    unloaded?
19        A.    I think they were standard.
20        Q.    And you have read Mr. Nichols'
21    testimony?
22        A.    Yes.
23        Q.    Do you agree that he doesn't
24    know, according to his testimony, whether
25    he was on a standard or a jumbo?
```

81

1          A.     He doesn't remember which barge;

2    correct.

3          Q.     Have you reviewed any records to

4    try to determine whether there were

5    standards or jumbos there on the two or

6    three days that this potentially occurred?

7          A.     I think there was both.

8          Q.     There was some comment made by

9    Mr. Baun that he thought the distances were

10   different, looking at your video and our

11   video, the distances between the barges.

12   Did you take measurements of the distance

13   between the deck of the empty barge and the

14   deck of the loaded barge on the day that

15   your inspection was done?

16         A.     Yes.  I think it was eight feet.

17         Q.     You think it was eight feet.  Did

18   you measure it personally?

19         A.     I measured it and someone else

20   measured it.

21         Q.     Do you have any notes or records

22   that indicates --

23         A.     Well, it depends where you took

24   your measurements from, because it was a

25   rake barge.

82

```
 1          Q.     Yes.  So at the rake it is going
 2    to be a shorter distance than on the side?
 3          A.     No.  At the rake, it's a higher
 4    distance.
 5          Q.     Well --
 6          A.     At the headlock.
 7          Q.     Yes, okay.  Let me back up.
 8                 You are suggesting to me that the
 9    rake of the empty is going to be pointed up
10    in the air; right?
11          A.     Yes.
12          Q.     And if you are dealing with a box
13    as a load, there is going to be a greater
14    distance.  But if you have a rake as a
15    load, then --
16          A.     You're talking about --
17          Q.     I am saying that --
18          A.     There is a differential between
19    rake to rake and rake to box, yes.
20          Q.     Exactly.  And that might account
21    for the difference?
22          A.     And it depends on the depths of
23    the barges, the two barges.  There are many
24    variables; correct.
25          Q.     Right.  So depending upon those
```

83

1    variables, you might have a five to

2    six-foot difference, you might have an

3    eight-foot difference; is that a fair

4    estimation?

5        A.    I would say the difference would

6    be between the light and the loaded a

7    minimum of seven feet to a maximum of nine

8    to ten feet.

9              MR. POWERS:

10                  The next thing I want to

11   do is mark as Exhibit 4 your videotape, and

12   you have agreed to send me a copy of that,

13   and I want to make sure the sound is on it,

14   too.

15             THE WITNESS:

16                  Not a problem.

17             MR. POWERS:

18                  Thank you.

19                  Now, the last thing I want

20   to put on the record, I have not been

21   provided the professional video, and I am

22   saying this because I know that you said it

23   has been sent to me.  I don't have it and I

24   know you will send it to me.  We have been

25   working together for a long time.  But if I

84

```
1    see anything in that video that I think I

2    need to ask Mr. Campana, then I reserve the

3    right to depose him on those issues.  And

4    should he issue any additional reports or

5    opinions, likewise; I probably could do it

6    by phone if we all agree to it.  But

7    anyway, I just want to reserve that right.

8                        Thank you.

9              MR. BAUN:

10                        Did you want to say

11   something?

12             THE WITNESS:

13                        Well, did you want to --

14             MR. POWERS:

15                        Off the record.

16                   (OFF THE RECORD)

17             MR. BAUN:

18                        It has become apparent in

19   the last couple of days to a week that we

20   now believe that there are four videos of

21   various -- well, two barge inspections:

22   One taken by Mr. Powers' partner,

23   Mr. Schroeder, one taken by a professional

24   videographer whom I hired, one taken by

25   Mr. Campana, my retained expert, and a
```

85

```
 1   third -- or a fourth taken by or on behalf

 2   of a Mr. Strauss, Mr. Powers' expert.

 3                      When we finally get it

 4   straightened out that both sides have all

 5   four videos and pictures, I think we all

 6   reserve the right to either amend reports

 7   or the right to retake the depositions of

 8   each other's experts.

 9                      How is that?  Fair enough?

10            MR. POWERS:

11                      Fair enough.

12

13   (Whereupon the deposition was concluded)

14

15

16

17

18

19

20

21

22

23

24

25
```

86

```
 1                WITNESS' CERTIFICATE

 2

 3                I, RON CAMPANA, have read or have

 4    had the foregoing testimony read to me and

 5    hereby certify that it is a true and

 6    correct transcription of my testimony with

 7    the exception of any attached corrections

 8    and changes.

 9

10                ( ) No corrections

11                ( ) Corrections attached

12

13                _____

14                RON CAMPANA

15

16

17

18

19

20

21

22

23

24

25
```

87

1              REPORTER'S CERTIFICATE

2

3                I, JULIANNE W. ANDRESSEN,

4       Certified Court Reporter in and

5       for the State of Louisiana do hereby

6       certify that the within witness, after

7       having been duly sworn by the Reporter to

8       testify to the truth, the whole truth and

9       nothing but the truth, did testify as

10      hereinabove set forth in the foregoing

11      pages;

12               That the testimony was reported

13      by me and transcribed under my personal

14      supervision, and is a true and correct

15      transcript to the best of my ability and

16      understanding;

17               That I am not of Counsel, nor

18      related to Counsel or the parties hereto,

19      and in no way interested in the outcome of

20      this event.

21

22      _____

23      JULIANNE W. ANDRESSEN

24      CERTIFIED COURT REPORTER

25      In and for the State of Louisiana